Mr. Raymond? Sir, good morning. Good morning, sir. And you may want to raise that lectern a little bit. There's a button, sir, somewhere there. You may proceed. Thank you, Judge. I represent Michael Stone, the appellant in this case. Mr. Stone has three claims of discrimination based on race and retaliation in this case under Title VII, 42 U.S. Code, Section 1981, and the Missouri Human Rights Act. And the complaint is in three counts. And counts four, styled Section 1981, actually incorporates the first three counts. And count five, the state law claim under the Missouri Human Rights Act also incorporates the first three claims. So all of that's on appeal. It's not true that Mr. Stone has waived his claim under the Human Rights Act or 42 U.S. Code, Section 1981. The first claim that Mr. Stone makes in this case involves his starting salary. The evidence as to whether McGraw-Hill offered and agreed to a starting salary of $95,000 for Stone or $85,000 as McGraw-Hill contends is in dispute. What is not in dispute is that McGraw-Hill paid Stone a starting salary of $85,000, which he protested, and that his salary was substantially lower than that of at least one other hiree who was Does the record show the protest of the beginning salary was an issue between he and the company from the inception of his employment? Is that something that we can discover from the record? Yes, there is some in the appendix in Stone's deposition some testimony that he complained that the offer that the Vice President McGinnis had made was initially $95,000 and not $85,000. Doesn't that all go away as a matter of contract formation when he accepts what he actually receives? I think that yes, to some extent, but it's important to note with respect to his claims of discrimination that he did complain that they did not actually give him the salary that they had discussed in the interview and that he understood that was going to be paid. But yes, he did ultimately accept the $85,000, and he went on to be promoted to the Learning Solutions consultant position. But our point is that there was some discussions. He understood it was $95,000. The Vice President and Manager Wiles, who he supervised, said that we're offering you $85,000. Take it or leave it. And yes, he did take that amount. Yes. The documentary evidence presented by Stone comparing his qualifications as to publishing sales experience to the other hiree who was paid a higher salary. There's one comparator that Mr. Stone is comparing himself to, and that is a fellow by the name of Ritter who was paid a higher salary, some $10,000 higher than Stone. Now, the experience qualifications for the LSE position, Learning Solutions consultant, are contained in a McGraw-Hill posting for the position. And this was a posting at the time frame that Stone and the other comparator, Ritter, applied for. And in that posting, it indicated there was five-plus years of publishing experience. Five-plus years. Now, McGraw-Hill has had some argument that, well, the job description, position description changed over time, but this was the position that Stone saw posted. This was the position he applied for, and it's very clear. And that is in the appendix, the position description that was in effect at the time that Stone applied. The other person, the other comparator, had – well, McGraw-Hill contains that. It was a minimum of two years experience, publishing sales experience, but that was not the job description that was in effect at the time that Mr. Stone applied for his position. Did the district court accurately describe the salary situation by pointing out that I guess there are five individuals with the LSE designation? Yes. And a couple make more and a couple make less or are comparable to what the plaintiff makes? It is true, yes. Besides Mr. Ritter, there was a second person, Mr. Scanlon, who was also paid a higher salary than Stone, and Stone is not challenging that. He's only challenging the comparator as to Brad Ritter, and the reason is because Ritter did not have the five years of publishing sales experience that was posted in the posting that Stone, when he applied for the position. He didn't have that. And, in fact, he didn't even have two years of requisite sales experience. Were they hired simultaneously or – Same timeframe, yes. It was the same timeframe. So that is the point there with respect to the differences in the salary. We contend that even looking at the posting and look at five years plus of publishing sales experience and the other fellow, Ritter, who had only a little less than two years' experience. Moving on, there was an issue about whether or not – a claim that Mr. Stone did not get the spot bonus as compensation for the period when he was working both as a sales rep and – that's the old position – and he was working as a LSC. That had occurred for several months. He lived in Florida. He came to Missouri. He was effectively required to work both positions, and he didn't get a spot bonus. Now, McGraw-Hill states that there was another person that didn't get a spot bonus as well, but there's no evidence whatsoever to support that assertion. We think that looking at – and it's all in the appendix – Stone's qualifications, looking at the posting, there is an issue of material fact as to whether or not he was paid a lower salary because of his race such that kind of one should be left to the trier of fact. Counsel, was the person getting the $95,000 in an area that has a much higher cost of living or not? What does the record show on that? McGraw-Hill did not substantiate that. They claimed that there was a difference in the territory with respect to the higher cost of living, but they did not offer any evidence to support that. That was an argument made, and keep in mind – so I think that's what we would say about that. Let me ask you another thing about the person making the $95,000. Yes. And I got confused in the briefs. Was this the person who had experience working for a competitor? It was, as I understand it, yes. I think he came from a competitor. In fact, I think most of the other – all the hirees for Learning Solutions Consulting came from competitors, including Ms. Wiles. Mr. Stone, in fact, had a longer tenure at McGraw-Hill than Ms. Wiles. She came in in July or August or so of 2012. If you add the competitor time, does it make the experience look right to get more salary? For Mr. Stone, it does. And we were just looking at, well, what does the posting say about the qualifications as far as publishing sales experience, i.e., five-plus years? And this is what he had been told. Not only was it in the posting, but Mr. Stone had been told by human resources and so on that this was the experience that was needed. So that's the point there. With respect to the housing environment claim, Manager Wiles, to whom Mr. Stone reported, uttered a statement in which she explicitly referred to Stone in a racially derogatory manner. That's in the complaint and that's also in the deposition testimony in the appendix. Ms. Wiles has denied making the statement. A statement of that nature, of course, shows racial animus. And, in fact, the statement had a very detrimental effect on Stone as an employee who had, up to this point, enjoyed a very lengthy and successful and rewarding career with McGraw-Hill. The appendix has listed the awards he received. He was a quite accomplished employee who had had a very successful career up until that time. Credibility determinations are left, of course, to the chart. In fact, we cite cases in the brief to that effect and are not decided at the summary judgment stage. Also, there's an incident in terms of the housing environment claim where- Were there any other language issues other than the one overheard? Were there any statements made directly to the plaintiff as opposed to overheard being made to a third party? No. There was an instance where Manager Wiles did report to McGraw-Hill Security that she felt threatened. There was no basis for that, and that went away. He was getting feedback from one sales rep in particular, and there was an affidavit in our appendix from a sales rep with whom Mr. Stone worked to the effect that this district manager who had grabbed him had at one point said, do not return his e-mails, do not work with him, do not return his phone calls. Those don't particularly deal with his color, I was just wondering, or his race. What other indicators were there of animus towards him strictly based on his race? Direct evidence would have been the one statement that I just referred to about him being hired and so forth. Just that one statement as far as direct statements indicate direct animus. Would it be fair to say there was no recurring current of racial epithets or anything like that? Not racial epithets, no. But looking at what Mr. Stone was expected to do and what the other consultants were expected to do, there's just a big difference there, and you just can't get around the difference. And we think that it's such that it raises a real issue as to pretext for discrimination. As far as the third claim, which is his discriminatory discharge, the learning solutions position should be distinguished from the sales representative position. The expectations of the learning solutions position are contained in the job description for the position, and that is included in Mr. Stone's appendix. The job description for the LSC position is critical in considering whether or not Mr. Stone's discharge was discriminatory. That is whether or not he was meeting McGraw-Hill's legitimate expectations. According to the job description, and that's in the appendix, and according to what he was required to do as compared to his counterparts, the district court notes that there is a strong inference that discrimination was not a motivating factor if the same person hired and fired Stone within a relatively short period of time. And the district court says there's a case on that. However, and I want to point out to this court that it is important to note that- Interrupt for a second. And were you going to reserve any rebuttal time? Just one minute. Okay. Well, I- And let me just say one point I wanted to make with respect to in looking at McGraw-Hill's contentions as to Stone's efficient performance. Mr. Stone did get a $30,000 bonus after he became learning solutions consultant for the period September through December 2011. And that covers the first sales quarter of his tenure as sales learning solutions consultant. We also point out in the brief other areas where we thought the district court simply made findings that were contrary to the evidence, that with respect to, for instance, the contention that Mr. Stone failed to timely send out letters of agreement, that's contrary to the evidence because the sales reps were not ready to receive or process the LOAs. There was a big issue as to him being required to work on campus with the sales reps all day, four days a week. And, again, I direct the court's attention to the job description for the position. It only required that Mr. Stone spend 20 percent of his time with sales reps in the field, whereas he was required to spend 80 percent of his time with sales reps. And that was very clear. There's e-mails, there's evidence in the file that is admissible to the effect that there's no question that he was required to do that, and all the other sales reps were not. I have 12 seconds. I'm going to save just for rebuttal. Good morning. You are Mr. Hurd? I am. Good morning. You may proceed, sir. Good morning. Thank you. I represent Defendant Apelli McGraw-Hill Global Education Holdings. Clearly, Mr. Stone is dissatisfied and disagrees with the reasons for his termination, for his salary, and his overall experience at McGraw-Hill. But he fails to connect that in any way to his race. He makes multiple allegations of disparate treatment between himself and others at McGraw-Hill, but he doesn't connect that in any way to it being because of his race. Well, doesn't it in some way connect it to his race when the person that hired him makes a statement indicating they wish they hadn't hired him and specifically references his race? Well, that was one stray remark, and as this court has held in the past, such a remark standing on its own is insufficient. I don't think one remark that, by the way, was not made to him. It's something he claims he overheard. But it was one remark that was made. Well, at this stage, we're pretty much accepting that side of the allegations. We take it as true. I understand that. But even if true, again, it is just one remark that this court has held is insufficient to establish that the atmosphere, his environment was— It certainly wouldn't, under existing precedent, prove a hostile work environment. There's no doubt the precedents wouldn't support that. But doesn't it support the potential of a race animus in the motive to terminate him? I don't believe so, Your Honor. It was, again, one comment that wasn't made to him. And the lower court determined that there were legitimate non-discriminatory reasons with no indication that his race was involved. Well, it sounds like you've skipped two or three stages. Doesn't he, on the compensation, make a prima facie case? He does not. Well, there's a white employee who paid $95. He's black. He's paid $85. Doesn't that get him about almost all the way there? First of all, there were six Learning Solutions consultants, including Mr. Stone. He was paid more than or at least the same as three of them, all three of whom were white. He doesn't dispute one of the white individuals who made more than him, Mr. Scanlon. And with respect to Mr. Ritter, he claims that he has more experience, but the reality is he was hired, Mr. Ritter was hired from a competitor, which required additional pay. I hear you arguing how rigorous is the standard at the prima facie case. And you're arguing it's very rigorous at the prima facie stage, right? Well, it's rigorous for him to point out somebody that is similarly situated to him. That's the $95,000 person doing the same work who gets paid more money. But was hired from a competitor to work in a different territory with different experience. At the competitor, the individual, Mr. Ritter— You're saying they weren't doing the same job. They were doing the same job, but you can pay different people different amounts for doing the same job. Boy, that gets dicey right there, though, once you say it's the same job. Go ahead. If there's a nondiscriminatory reason for the— See, once you go to—I'm interrupting you because once you go to nondiscriminatory reason, you're kind of at the pretext sort of stage. You're kind of saying, well, they got kind of a prima facie case, but then now let's talk about whether it's really a pretext. Well, no, because in order to establish a prima facie case, he has to show that there were similarly situated people in all respects who were treated more favorably than him and not in the protected class. My argument would be that Mr. Ritter was not similarly situated. Yes, he did perform the same job, but he came into that job with a different background, a different experience, and he was hired from a competitor. And my point is that that would separate him from Mr. Stone and explain why he was paid differently. Was the $95,000 person in a different cost-of-living area? Is that in the record or not? Well, what is in the record is he was in Columbus, Ohio, and that McGraw-Hill had determined that that was a different cost of living. Quite frankly, Your Honor, I don't know what the cost— No, no, but I mean, I'm talking about what the record shows. I understand. And whether you put it in the record and the other side did anything about it. It is in the record that he worked in Columbus, Ohio, and the McGraw-Hill— And where did the $85,000 person work, St. Louis? Yes, the $85,000 person. So it's St. Louis and Columbus. Correct. Okay, personally. Correct. The other issue that he raises with respect to compensation is the spot bonus. But, again, he hasn't identified anyone who even received a spot bonus, let alone anyone who received it who was similarly situated outside the protected class. And, therefore, he hasn't identified anyone who is similarly situated with respect to the spot bonus and received that bonus. With respect to the hostile work environment claim, as Your Honor pointed out, he only identifies one comment that has anything to do with race. And that is insufficient to establish a hostile work environment claim because it doesn't establish that the environment was permeated with severe and pervasive hostile comments or actions in any way. Would you take the position—and I'll put words in your mouth—that while we may wince at the words, the words aren't bad enough to make it a racially hostile environment? Yes, I would take that position. I believe the Supreme Court has taken that position in Harris, that a racial epithet, while offensive, is not sufficient to establish a hostile work environment claim. In the Harris case, was it by a decision-maker, do you recall? Was the utterance of the epithet by a decision-maker as opposed to somebody that isn't really the decision-maker? I don't recall that. I don't either. That's why I asked. I apologize. That's okay. But I do believe that even if it is by a decision-maker, particularly in these circumstances where it was not made directly to Mr. Stone, that it would be insufficient. And when you couple that with the other incidents that he claims occurred that have no element of any racial animus, the things that he's complaining about, he can't establish that those are sufficient to establish a hostile work environment claim because there's simply no racial component to them other than the one comment. Would you agree one epithet by a decision-maker at the right time, say the firing moment, that would be a pretty good case? Perhaps. Perhaps. Obviously, this wasn't the situation, but I understand what you're driving at. But instead, with respect to his discharge, the situation was that he had been spoken to multiple times from January 2012 until his termination, and it's well documented what his performance issues were, including lateness, including other sales reps not wanting to work with him, including his responsiveness and his organization. And he was spoken to on multiple occasions. And our position is that those are legitimate, nondiscriminatory reasons to terminate him, separate and apart from any alleged comment that Ms. Wilds made. So you're saying the record is undisputed, that there's documentation for the alleged deficiencies, for the absences in particular? Is that a matter of record? In the record, there are multiple emails from Ms. Wilds to Mr. Stone explaining to him the problems that he's having. There's a written warning which explicitly lays out the various performance issues. I said absences, but I think the allegation was tardiness. Tardiness, yes. Were those documented as to when and at what frequency they occurred? They are documented in the written warning and in some of the, what Ms. Wilds did is she would email Mr. Stone after they spoke and say, recap the conversation that they had. And in those emails, she identifies lateness as one of the issues. But it's not detailed. I'm sorry? But it's not detailed. I don't believe there's anything in the record that specifically says you were late on this day, you missed this meeting. I recall one meeting where one of the sales reps complained that he was late in showing up for a campus visit. But I don't believe there's any specific chart or anything like that that lays out every time that he was tardy. Now, once we get past that, the legitimate nondiscriminatory reason, we go into pretext. And he hasn't identified anything that would explain how race is connected to the discharge decision. He disagrees clearly with the performance issues, and he argues about whether he did or did not do the things that he was faulted for. But he hasn't given any reason why that McGraw-Hill didn't believe, honestly believe that he had these issues. And he also doesn't provide any connection between those issues and his race. He simply says that he disagrees with them. He hasn't identified anyone who is similarly situated to him, which includes has the same performance issues that he had at the time that he was discharged. And so our position is that he has not identified any causal connection to his race, such that the criticisms were legitimate and he hasn't been able to establish pretext. Was the termination decision a decision of a committee or a group, or was it his supervisor's decision? It was Ms. Wild's decision, ultimately. There were other people who complained about him, and I think Ms. Nentwig may have had some input into the decision, but ultimately it was Ms. Wild's decision. And she was the individual that had, I guess, the confrontation with him, physical? No. Yeah, Ms. Nentwig was, yes. And, again, he attributes that, Mr. Stone attributes that to her being aggressive, and he testified that he had seen her do that with other people. He doesn't give any explanation that it was due to race, and Ms. Nentwig isn't accused of making any racial comments whatsoever. And I also want to point out, with respect to Ms. Wild's comment, that Ms. Wild was the individual who promoted Mr. Stone about seven months earlier. And so there is an inference from that of non-discrimination. Well, isn't that pretty much wiped out by her later comment? Because the later comment can be interpreted, I'm going to fix the mistake I made in hiring this individual. I don't believe so. I mean, I think what that shows is that she truly… Whatever goodwill you'd get from hiring him seems like you jeopardized by making the comment you wished you'd never done it based on the person's race. Well, I think what her promoting him to begin with shows is that she wasn't, did not have racial animus towards him, or she wouldn't have hired him to begin with. And I think what that shows is maybe it calls into question whether she ever made the comment to begin with, but it's certainly… Sometimes corporations and companies hire individuals for reasons that supervisors hire reasons they've been instructed to or been given incentives to do so. Well, there's no indication on this record that Ms. Wilds was influenced by her superiors or anyone else, any type of policy or anything like that to hire him despite her not wanting to. There's absolutely no evidence in the record of that. And so I would argue that her hiring him or promoting him shows that she didn't have any discriminatory animus towards him. And it would seem strange that someone who at that point didn't in September of 2011 suddenly in April of 2012 is firing him simply because of his race. In essence, your argument, I guess, is for your company that Mr. Stone failed to heed the suggestions the company made to improve his performance in terms of punctuality and attitude, and he paid the price for it, in effect, by being discharged. Correct. And there's no basis to conclude that that was motivated by race. I don't have anything further unless anybody has any questions for me. Thank you, Counsel. Thank you. Let's see. Does Mr. Raymond have any rebuttal time? I did have 12 seconds. Well, it has ticked down. We'll give you a minute and a half. We'll give you a... At the case, I do want the court two things, to really look at Mr. Stone's evidence here. I mean, just because McGraw-Hill says that he's bad, I mean, that doesn't prove it. I mean, we look at the actual evidence here. For instance, they say on this issue about being late to meetings with sales reps. I mean, no evidence in this record substantiates that. Stone has... I'm sorry, I'm having trouble hearing you. I said that. I'll have to put in my hearing aids next time. Okay, I said that. In any event, there's no evidence of what? That to substantiate their claim that Stone was consistently late in meetings with sales reps on campus, Stone offers two affirmative evidence from two people, and not just one, two people, Ms. Borwald and Mr. Broshy, that he was never late for any meetings with them. I thought there were e-mails to him that said that, though, right? Excuse me? I thought there were e-mails to him that said he was late. Well, there were contentions made he was late, but I'm only saying that's not so, and I have two people who he worked with say that he was never late. McGraw-Hill offers nothing to substantiate his claim that he was consistently late with meetings. The same thing with respect to the weekly telephone. There is one thing in the record. McGraw-Hill says that he missed a weekly team telephone conference in March of 2012. Well, I mean, Wiles acknowledges, and look at the evidence, that in an e-mail, she received advance notice from Stone that he would not be available for that meeting because of the presentation he was required to attend with a sales rep. That's Mr. Broshy. His affidavit is in the file. One last thing I think is very important is that Mr. Stone, as far as the expectations for him being different, he was required to work with sales reps four days a week out of five. That was before the written warning was issued six months later in March. So from the very beginning, the expectations for Stone were different because he was told by Manager Wiles that, I want you to work four days a week out of five with sales reps in the field on campus. There is evidence in the file from other sales reps who worked with consultants that, no, we didn't have to do that. We didn't have to do trip reports. Again, this was before even McGraw-Hill contains that Stone started having all these performance issues, and that's very important in terms of the expectations from the beginning for him were so different from all of his comparators, and I think the district court missed that. I think the district court misread the evidence with respect to all the working conditions, not only just the statements but all the expectations of Stone as compared to the coworkers. I think that is critical in examining whether or not they have made a case that Stone's performance was deficient. Well, we will consider that carefully when we study the record. All right. Thank you. We thank both sides for the argument. The case is now submitted.